**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

~FILED~

MAR 0 4 2022

At _____ M
GARY T. BELL, Clerk
U.S. DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

Versie C. McClay Chatman |
|
Plaintiff |
|
v. | Case Number 2:21CV397
|
Felicia L Evans, Nikki Wielgos, |
Margaret Pruzin, Lynda Woods Brown |
a/k/a Lynda Woods Brown Allen |
Athena Soleim, Crisis Center, Inc., |
Alternative House, Crisis Center, Inc., |
Alternative House Board of Directors |
Defendant(s) |

## AMENDED EMPLOYMENT DISCRIMINATION COMPLAINT

1. My address is:  4406 Broadway, Gary, Indiana  46408

2. My Telephone number is:  (312) 330-0142

3. The Defendant's address is:  101 N. Montgomery, Gary, Indiana  46403

4. The action is brought for employment discrimination pursuant to:

    ☒  Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17.

    ☒  Age Discrimination in Employment Act of 1967 29 U.S.C. §§ 621 to 634.

    ☒ Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12112 to 12117.

☒ Other:  Prohibition against retaliation and coercion 42 U.S.C. § 12203 (a), (b), (c),
Whistleblower Protection Act of 1989, 5 U.S.C. 2302(b)(8)-(9), workplace harassment, Indiana
Code Title 35, Criminal Law and Procedure § 35-45-2-2, hostile work environment

5. I filed a charge of discrimination with the Equal Employment Commission or the Indiana

    Civil Rights Commission on:  5/21/21

6. The date on my Notice of Right to Sue letter is:  10-7-21

7. The date I received my Notice of Right to Sue letter was:  10-12-21

1

## CLAIMS AND FACTS

1.     Plaintiff, Versie C. McClay Chatman,  hereinafter referred to as ("Versie") was employed with the Defendant Crisis Center, Inc., Alternative House, hereinafter, referred to as ("Crisis Center") located at 101 N. Montgomery Street in Gary, Indiana  46403   Versie C. McClay Chatman is filing this Amended Employment Discrimination Complaint as a Pro Se. In addition, Versie C. McClay Chatman is also attaching the updated EEOC Form 5 that was not included in the original complaint.

2.     Versie was employed with Crisis Center from June 19, 2019 until April 26, 2021. Versie was interviewed, and hired by Felicia L. Evans, hereinafter referred to as ("Felicia"). Versie was hired as a part time Residential Staff worker.  Versie remained in a part time status until April 26, 2021.. Versie became a driver for transportation.  Versie picked up and dropped off the clients to school, as well as medical appointments, and any and all transportation needs. Versie was abruptly put on the schedule as a teacher in the e-learning classroom by Felicia for full time beginning in September, 2020. *(See Exhibit B, pps 21)*  Versie helped the children with classwork assignments via e-learning. *(See Attachment 1, pp. 2)*  Versie's work performances were never an issue, and Versie received no warnings or write-ups for the duration of Versie's employment.  On Versie's evaluation, Versie's overall rating was "fully achieves expectations" *(See Attachment 1, pps 1-3)*

3.     While employed at Crisis Center Versie reported directly to Defendants,  Felicia L. Evans, Program Manager, Chakara Gunn, Program Manager, (Chakara Gunn was terminated) and Athena Soleim MSW, LCSW, Program Director.

4.     Versie monitored an innumerable amount of children (oftimes boys and girls together), while in the classroom-- all alone. Anytime Versie asked for assistance from Felicia, it

fell on deaf ears.  Versie met with Nikki Wielgos, hereinafter referred to as ("Nikki") in reference to having the children sitting all day in a classroom, and the effect that could have on them.  Versie spoke to Nikki about being put in a classroom alone, with all the kids, while other co-workers had help.  Versie spoke to Nikki about the children not being able to go in the kitchen to eat, as the rules were changed by management (i.e., Felicia and Athena Soleim, hereinafter referred to as ("Athena S.") that the kids had to stay in the classroom and eat.  Felicia and Athena S. did not want the children to walk pass their offices, and forced the children to stay in the classroom all day until it was time for them to retire to their dorms to rest before being called for dinner.

5.      All of a sudden the children were not allowed out of the classroom, and had to eat lunch in the classroom as well.  They were not even allowed according to Felicia and Athena S. to go and get water.  A pitcher of water and cups were bought into the classroom; so the children would not come out.  Versie was forced to stay in a classroom with the children from 7 am until the time to end, between 2 to 3 pm, with no breaks or lunch.  The Crisis Center required Residential Staff/Versie to work 8 hours a day with no lunch, and no breaks, however this is not in violation of Indiana law.  Versie was not allowed to leave the building for 8 hours or more. Versie asked the custodian (Carolyn) who would walk past the classroom door, to sit with the children while Versie ran to the washroom.  Carolyn would also go and pick up a lunch plate from the kitchen for Versie.  Oftimes, Versie could not put her food in the refrigerator because no one would relieve Versie in the classroom.  As a result, Versie could not go get her food out of the refrigerator or warm it up.

6.      Versie also monitored the children's inappropriate use of the computers on non-school related sites, and this was documented in Versie's staff notes.  The children were not

mandated to wear masks during the first pandemic, while in the classroom. The children would not be 6 inches apart. All the children were cramped into a classroom, out of site. Ms. Marcel inquired as to why children did not have to wear masks. Ms. Marcel was told by Felicia that "the children do not have to wear masks, because this is their home."

7.      Versie was interviewed and hired as a part time Residential Staff by Felicia. Versie specifically told Felicia that Versie could only work part time for a certain amount of hours because Versie was receiving social security disability benefits. Versie told Felicia that Versie could not go over the social security disability income limits. Versie made Felicia aware of the income limits for social security disability. Felicia told Versie that another employee was working part time because she was also receiving social security disability benefits as well, and had only a certain amount of hours she could work.

8.      After Versie was hired, and became employed with the Crisis Center, Versie later learned that the other worker that was part time and on social security disability was named Ms. Marcel. Felicia also stated to Versie that "you don't look disabled". Versie told Felicia that "I am disabled, and I do not feel comfortable disclosing why I am disabled."

9.      Defendant, Felicia worked on composing a schedule of times and days to be worked by Residential Staff for the coming weeks on a daily basis. Staff sent Felicia their availability. Felicia was supposed to match staffs' availability on the schedule to the availability times the staff submitted. Versie would send Felicia Versie's availability for the upcoming week; however Felicia would not adhere to it. Felicia knew that Versie was part time and had social security disability income limits. *(See Exhibit A, pps 1-113)*

10.      Versie would routinely tell Felicia via text messages, word of mouth, and email of Versie's social security disability income limits. *(See Exhibit A, pps 1-113 and Attachment 2,*

4

*pp. 1)* Felicia would disregard it, and put Versie on the schedule anyway for full time hours (with no benefits).   Versie told Felicia that Versie did not want to lose Versie's social security disability benefits. *(See Exhibit A, pps 1-113)*

11.     Versie needed the job as it was hard to make ends meet with only a monthly Social Security disability check.  On the other hand, social security does allow you to work, as long as the income does not exceed social security disability income guidelines.  Versie was allowed the 9 month trial period under social security to make any amount; however that was not the case when working for Crisis Center.

12.     Felicia put Versie on the schedule so much that Versie's part time salary nearly doubled in Versie's second year. *(See Attachment 3)*   During pre-COVID, the Social Security Disability office would monitor Versie's income.   Then Social Security would contact Versie every six months, however when COVID hit everything was readjusted.   Versie did know she worked over; but not to that extreme.  Versie figured she would be able to balance the hours later on.  Versie continued to tell Felicia that Versie could not keep doing this, and Felicia took advantage, as Versie needed to earn a living.   At one time when Versie was put on the schedule for full time, Versie told Felicia that she would have to quit, because she could not continue to work full time hours, at the risk of losing  her social security benefits.  For a while Felicia did stop.  Versie's checks were automatically deposited, and Versie was not able to get into Crisis Centers' Paycom to see her paystubs, as Meara Dowell, Administrative Assistant; hereinafter referred to as ("Meara") had to help Versie and other staff because employees had a hard time getting into Paycom.

13.     Felicia would thrust Versie on the schedule and if Versie did not show up, it was considered a "no show no call." Versie would face disciplinary actions as a result.  Felicia put

Versie on the schedule for days and times Versie did not know about or ask for. Versie did not show up many times because Versie did not know Versie was on the schedule.   Versie was not written up for a no show no call because Versie had no idea Versie was on the schedule.  Versie explained this to Chakara which is the reason Versie was not written up.  Felicia did this so frequently that in March, 2021, (for the month of March); Versie gave explicit hours of her availability.  Versie did this in an effort not to be considered a no show no call for being put on the schedule for dates and times Versie was not available for.  Did not ask for and knew nothing about. **(See Attachment 5(a)).**

14.    At one point Felicia stated with regards to Versie's  social security disability benefits, after Versie's  pleas to stop the excessive hours was "we are going to deal with social security and pay back what we have to".  Felicia went on to state that "we are so short staffed, especially with this COVID."   Majority of the staff went on to work excessive hours to try and help Felicia out of a pinch. Oftimes staff hours would exceed a 40 hour work week, but these workers were in agreement with the excessive hours, and were not on social security disability, with the exception of Ms. Marcel.

15.    In addition, Versie continued to send Felicia emails, text messages, and phone conversations repeatedly in which Versie stated that Versie could not work full time hours Versie reiterated that she was on social security disability, and did not want to lose her disability benefits.  *(See Exhibit A, pps 1-113) (these are phone text messages where  Versie and Felicia corresponded with each other, dating back to 2019).*

16.    At one point when Versie  told Felicia Versie  could not work these full time hours, Felicia stated: "Just wait until things change!",   as the organization was going through another transition from Campagna to a new administration.   Felicia repeatedly stated: "I am

6

going to fire you and get full time people. I need full time people!   Felicia would gossip untruths vehemently, as well as pit employees against each other creating a toxic/hostile environment. Felicia had no problem talking about employees behind their backs to other employees. Felicia also used her position to gain confidential information to disclose Versie's age to staff and clients.

17.     As a result of excessive hours; on April 22, 2021, Versie  received documentation from the Social Security Office stating  Versie's benefits would stop as a result of working full time.  *(See Attachment 3(a))*. After receiving *Attachment 3(a)*,  Versie  wrote a letter (dated April 2, 2021), and hand delivered it to Athena S. on April 8, 2021. *(See Attachment  4)* Versie tried putting the correspondence under Felicia's, and Chakara Gunn's doors, but the envelope was too bulky.  Athena S. was in her office, so Versie  gave Athena S.  her envelope.  In addition, Versie gave Athena S., Felicia's and Chakara's envelope.

18.     Versie explained to Athena S. that the envelopes were too bulky to fit underneath their doors.  Versie asked Athena S. if she would give the others their respective envelopes; of which Athena S. did.  Versie also went to the administration side, and put the envelopes for Meara Dowell, and Nikki underneath their respective doors.

19.     On April 14, 2021, Versie received an email from Margaret Pruzin, (Director of Finance and Administration), hereinafter referred to as ("Pruzin"), with a cc: to Nikki regarding Versie's correspondence. *(See Attachment 5)*

20.     After Versie participated in  the  complaint process, by speaking out through the hand delivered letter, Versie was subjected to increase scrutiny,  retaliated against and taken off the schedule, as well as  discriminated against by Athena S. on behalf of the administration of Crisis Center.

21.     On Sunday, April 25, 2021, Versie  received a call from Jennifer Moser
(hereinafter referred to as "Jennifer") (a white employee) to come in for a few hours to relieve
her at the hospital, and Versie  told Jennifer Versie  could not come in.

22.     Then again on (the same day)  Sunday but at 11:13 pm Versie  received a text
message from Athena S. Athena S., as well as Versie knows that a hospital stay can expand over
two shifts until they could find  someone to relieve me.  This would again have put Versie even
more over the part time hours with Social Security disability for April.

23.     Athena S. sent Versie the following text message, even after Versie's
correspondence to administration *(See Attachment 4)*  Please see text message dialogue below
from Athena S to Versie  for Sunday April 25, 2021:

Athena S.     Can you come in to work midnights?

Versie:        When?

Athena S.     Tonight

              Can you sit with a girl in the hospital and currently and relieve jen?

              **She's there now and we don't know if she will be admitted.**

Versie:        Not tonight.  I wish I had of known earlier.  Jennifer' called me earlier for the
same thing at the last minute of my event... **but she said a couple of hours**.  I wasn't able to do
it at the last minute today because I made plans based on your schedule.  I had my hours planned
for the day into the night because I was off.  It is too late for me to rearrange anything now.  I am
sorry.  I usually base my life off of my hours.  So when I am off I make plans on my off days and
the hours that I am available.  I am so sorry

Athena S.:     We had you listed as back up on the schedule though for this reason.  I thought
you would be aware of that.

Versie:        Back up. This is what you said: "Please see schedule for next week for the Crisis

Center. Due to current census, our schedule reflects our current needs. Should we get more

clients, we will be able to offer more shifts. Please note if you are back up, we may ask you to

help out. We will do our best to notify asap so you can be prepared for that shift. Our needs

fluctuate based on census." *(See Attachment 6, pps. 1-3)*

   24.    Versie was hired as part time. Versie was never told about a backup status when

hired. Since Versie began employment, no one was on a backup status. *(See Exhibit B, 1-39)*

Furthermore, while Athena S. referenced backup, and asked Versie to come in; Athena S. also

stated that "we will do our best to notify you asap so you can be prepared for that shift."

Suffice to say,   Jennifer called Versie earlier to replace her at the hospital, and Jennifer stated it

was for a couple of hours. When Versie was not able to come in, then Athena texted Versie at

11:13 pm  and stated: "She's there now and we don't know if she will be admitted." Athena S.

stated she listed Versie as  backup for this reason.    While employers can change the rules as

they see fit, employees still have rights. Versie was not hired for backup. Athena put Versie on

backup and then stated. :"I though you would be aware of that".   There was no policy on

backup in the handbook.  In the fact finding conference when EEOC questioned Athena as to if

she talked with management about this new backup policy/ Athena said "No. She was just

trying something." This call for backup was *not* for a shift, *it was to relieve staff* at the hospital.

Shifts are usually 8 hours, but Athena S. had no idea how long the stay at the hospital would be,

as she stated "She' there now and we don't know if she will be admitted." Versie C. was on

social security disability and could only work a certain amount of hours..

   25.    Suffice to say that in Versie's letter cc'd to Athena S., regarding excessive hours.

*(Attachment 4)* Pruzin's reply states "You chose to work all the days scheduled and there are

no write ups for failing to show up for work." *(Attachment 5)* On the other hand, *(Exhibit A, pps 1-113)* as well as *(Attachment 4)*, shows Pruzin's statement to be untrue. Not to mention this flagrant abuse of power to force Versie to come in at any and all hours. In addition to the retaliation Versie received for not relieving Jennifer for a shift that again would have put Versie over social security income limits.

26.     Also in *(Attachment 5)*, Pruzin states: "If you had given us legal documentation or a Dr. restrictions, we would have limited the amount of hours you worked." Ironically, Felicia has a history of spewing employees personal and confidential information all around the office, and against Versie's wishes told staff members and clients Versie's age, and that Versie was old. According to law, over 40 is old, but not to be discriminated against. An employer is only required to provide work-related accommodations if you disclose your disability to the appropriate individuals. Felicia and Sereese who works in Administration are not people who treat employee information with respect and confidentially.

27.     Versie did not need any work-related accommodations, Versie needed to work part time according to Social Security disability income guidelines, and Versie expressed Versie's social security disability and hours with Felicia over and over *(See Exhibit A pps, 1-113)* Versie disclosed in the interview with Felicia that she was receiving social security disability, and could only work a certain amount of hours. This is why Versie worked a part time job, where Versie could pick her own part time hours, not to exceed social security disability income guidelines.

28.     In Crisis Centers' own Employee Handbook it states under Pre-Employment Required Documents that a "Physical exam and release" is required. Versie was not asked for a "Physical exam and release" *(Attachment 7, pg. 2) at the bottom of the page* in the initial

interview nor during the course of employment. Nor was Versie asked per Crisis Centers policy under Post-offer Employment *(Attachment 7, pg. 1)* for "written clearance by a physician after a physical exam".

29.     Felicia did not specify that legal documentation or a Dr. restriction's was required for social security disability during or after the interview process.  In addition, no staff was required to take any physical or submit to any clearance by a physician before employment.  No staff was terminated within seven days of employment for not doing so  contrary to Crisis Centers' handbook. *(See Attachment 7, pps 1-2)*

30.  .   Crisis Center's employee handbook was stamped "draft"; however the handbook was handed out to the staff in a staff meeting by Meara as a mockup of the original.  Up to Versie's last day, no employee handbook was given to staff as a non-draft version.  No email was sent to staff relating to a non-draft version of Crisis Centers' employee handbook being available.

31.     Prior to not relieving Jennifer Moser, Versie was on the schedule. *(See Exhibit B, page 40)* Then after Versie did not relieve Jennifer, Versie was taken off the schedule and put on backup.  *(Exhibit B, page 41)*

32.     From the time Versie began employment dating back to 2019, Versie's Exhibits show that there has never been anyone on the schedule as a backup. *(See Exhibit B, pps. 1-39)* A backup was never mentioned in the "draft" employee handbook, not even under Crisis Center's lay off policy or the table of contents. *(See Exhibit C)*

33.     There was a  Fact Finding conference with EEOC; and  in attendance were Versie, Felicia and Athena S..  The EEOC Investigator J. Bennett asked Athena S. "where did backup come from"?   Athena could not give an explanation as to where this backup came from,

and Athena S. stated that "she was just doing something."  At one point in the fact finding conference, the EEOC representative stated to Athena S., "You are sending up too many red flags."  Felicia stated that she never heard of back up.  Felicia has been employed at Crisis Center for over 10 years. Felicia also stated that she gives employees at least four hours' notice when asking an employee to come in.  The EEOC representative asked Athena S., why did she call Versie again, after Versie stated that she could not come in the first time?

34.    In *(Exhibit B, pps 1-42)* are the schedules dating back to 2019 when Versie began employment.  In that time when census was up or down, there was never a backup status on the schedule.

35.    Prior to not relieving Jennifer Moser, Versie was on the schedule. *(See Exhibit B, page 40)* Then after Versie did not relieve Jennifer, Versie was taken off the schedule and put on backup.  *(See Exhibit B, page 41)*

36.    Athena S. blatantly retaliated against Versie, because Versie did not relieve a white employee, Jennifer Moser and then Athena made a new schedule.  Not to mention after Versie hand delivered a letter on April 8, 2021.

37.    After Versie questioned the backup on April 25, 2021; on Monday, April 26, 2021 at 2:42 PM, Athena S. sent a new schedule. On this schedule Athena S. had taken Versie off of backup, and stated "See updated schedule.  We welcome Mr. Anthony Pierce to the team and he is shadowing this week and Myles and Bryson back on.  Thank you all!"  *(See Exhibit D, pps. 1-2)*

38.    Mind you, just days before, prior to the new hire, Athena S. sent the following message on the schedule: "Please see schedule for next week for the Crisis Center.  Due to current census, our schedule reflects our current needs.  Should we get more clients, we will be

able to offer more shifts.  Please note if you are back up, we may ask you to help out.  We will do our best to notify asap so you can be prepared for that shift.  Our needs fluctuate based on census."  *This message was also delivered via text message from Athena S.* **(See Attachment 6, page 3)**  So with the census being down, and a low census as Athena S. stated: "Should we get more clients, we will be able to offer more shifts . . ."  Then when Versie questioned this retaliatory practice, Athena S. sent a new message naming a new employee (Anthony P.) hired in in the midst of a low client census, and totally removing Versie from the schedule.  The new employee was assigned to Versie's normal night hours as a shadow. ***(See Exhibit B, pg. 42)***

39.     At the bottom of the schedule Athena S. prepared it clearly states: "If on backup we may ask that you arrive for the shift if we have a call off.  Please contact Athena or Shanta for clarification." ***(See Exhibit B, pg. 42)***  However, when Jennifer called Versie and Athena S. texted Versie  it was not a call off. This was to relieve  Jennifer  in the hospital, and that is a difference.

40.     Then Athena S. retaliated and discriminated taking  Versie  off of now a  backup on the schedule, but put Myles and Bryson back on the schedule.  Both Bryson and Myles were part time workers as well.  Versie replied to the text Athena S. sent, and stated:

"Let me understand.  This.  So you took me off the schedule and then put me on call with no notice given and days later you are announcing a new employee after you announced downsizing.  Am I reading this right?  Your explanation was the census.  Again I am reading this right?" ***(Exhibit D, pg. 2)***

41.     A "backup" classification on the schedule is noted nowhere in the  Crisis Centers November, 2020 Employee handbook.  (Please see the table of contents for the Crisis Center handbook, ***(See Exhibit C)*** .  Layoffs and Recalls are noted, but nowhere is it noted through the

Employee handbook that employees will be placed on backup. However, Athena S. informed the EEOC that this new employee (Anthony P.) was full time as well, as the reason for taking Versie off the schedule.

42.     Shortly after Versie's text message on the thread that Athena S. sent to all staff, Athena stated to Versie that this wasn't the platform to discuss anything. Then afterwards, Athena S. stated that she took Versie off the schedule because Versie refused to sign the memo. However, Athena S. never arranged or sought to arrange a platform to talk with Versie. *(See Attachment 8)*

43.     So just days before Athena stated because of the census Versie was being made as a backup, then when Versie was not able to come in to relieve a white employee, and this was not to replace a call off as stated on the schedule for backups. Then Athena S. stated that she hired a person. Not to mention the same census was low, and had blatantly taken Versie off the schedule as retaliation and discrimination. Then Athena put Myles and Bryson back on the schedule, and they were part time as well.

44.     Athena S. stated to Versie that she had sent Versie an email, and she was wondering why Versie didn't respond, and Versie told Athena S. that Versie didn't see it. Athena S. went on to say that now Versie was not on the schedule because Versie did not sign a memo *(See Attachment 9)* of which the memo was signed and sent back to Athena S, and Versie was still not put on the schedule. *(See Attachment 9, pp. 2)*

45.     Ironically, the email *(See Attachment 8)* was dated April 23, 2021, but on April 25, 2021, Athena S. wanted Versie to come in for Jennifer. There was no mention from Athena S. of not signing a memo on that date.

46.     Initially on 4/14/21, Versie refused to sign the memo *(See Attachment 10)*, as Versie had done nothing wrong, and then it stated "by signing this, you agree to the policy and have been issued a warning."  However, when Athena S. wanted Versie to come in  for Jennifer weeks later, not signing the memo wasn't an issue. As a matter of fact, Athena S. had taken Versie off the schedule, and then wanted to explain the memo, as well as stating it was a requirement. *(See Attachment  8)*  The memo was dated March 31, 2021.

47.     Athena S. has a history of treating  whites differently from blacks, and this treatment has played out among the client base of blacks and whites as well.  A black client became very aggressive and fought Athena S.   This child client tore up Athena S.'s office, because the client did not like the disrespectful, degrading tone Athena S. was using toward a Black male employee, a/k/a Anthony.  That client who fought Athena S. was enraged and  stated to Athena S. that "you should not be talking to Mr. Anthony  like that in front of everyone." Many clients  have accused Athena S. of being prejudiced and/or racist.  Staff has made accusation of Athena's prejudice.  Athena S. talked to blacks any kind of way, oftimes degrading.

48.     In another instance, a black male client, was called all kinds of "niggas" by a white girl client.  The white girl client hit the black male over, and over, and over, and over again and just repeatedly kept striking him.  He  tried resisting her, and she hit him again, and the white client called the black male client all kinds of "niggas".  After too many blows by the white client, the black male defended himself, and hit the white client repeatedly.   The Black juvenile male was sent to jail and could have faced a  felony.  However, Athena S. never showed the video tape of what the white girl did to the black male.  The white girl was still at the Crisis Center.  The staff had to put her in protective custody on the boys unit, because the

African American clients were enraged with her calling blacks "niggas". The white client beat the hell out of that black male child.   The white girl could not go to the girls unit, because those black girls were angry and infuriated with what the white female client did to the male client who was taken away to juvenile jail. Had it been a white male client, it would have registered as self-defense. Athena S. never showed or offered to show the police a video showing the white girl provoking and hitting the black boy repeatedly.

49.     In another instance, a black female client hit a white staff member (Jennifer Moser), and was sent to jail after Jennifer pressed charges. On the other hand, Black employees have been beaten, bitten, hit and Blacks were told they could not press charges against clients.

50.     In April, Versie told Athena S. that an employee that worked on the night shift with Versie was sleeping and Versie was doing all the work. Athena stated she knew it, and who it was.   Ironically Lynda Woods Brown Allen, hereinafter referred to as ("Lynda") (a close friend of Felicia), had reported to Felicia and Versie that Ms. Eundee sleeps all time. Lynda went on to tell Versie that they had watched the videos; and they only see Versie moving around and doing the work. Lynda stated to Versie at various times that Ms. Eundee was sleeping, and she could see it on the camera from the boy's side. Lynda stated to Versie on various occasions that Ms. Eundee just sleeps.

51.     All African Americans worked on the night shift, and after Athena S. hired a white day time custodian who was Athena S's. personal house custodian then Athena S. sent out memos that the midnight shift is ordered to clean up. In addition to night shift regular monitoring duties;  Versie refused to sign the memo as it was a verbal warning, because Versie had not did anything. *(See Attachment  8)*

52.     In the Crisis Center Employee handbook under Disciplinary Action *(See Attachment 13)* it states the procedures for verbal warning.  It  is not sending a memo and forcing employees to sign the memo or be removed from the schedule.  Athena S. personal white custodian who worked for Athena S.'s at her home, was hired as a custodian for Crisis Center.  Mind you, the Crisis Center is a 24/7 facility, Athens's custodian only works days.  On the other hand there  was a black custodian (Carolyn) and when Carolyn worked there the midnight staff was never ordered to clean up.  Versie signed the memo and emailed it back to Athena, *(See Attachment 9)*, and Versie was not put back on the schedule.

53.     When Versie  told Athena S. that an  employee (Ms. Eundee) was sleeping, Versie  asked  Athena S.  to keep it confidential, however Athena S. said she already knew, and had watched the videos.  Versie  did not take a photo of  Ms. Eundee, Versie took a photo of the mirror where you could see the reflection of Ms. Eundee.  Versie never  sent or showed a picture to Athena S.  Versie asked Athena S. to keep it confidential about Versie reporting an employee sleeping, and Athena S. said she would keep it confidential.  Versie told Athena that she did not want a backlash for revealing the truth or how unfair this was.   Athena S.  assured Versie that she would keep it confidential.   Athena S. created a hostile work environment.

54.     On Monday, April 26, 2021, Lynda Woods Brown Allen, hereinafter referred to as ("Lynda") who is a friend and confidant to Felicia called Versie on Versie's personal phone with  a demeaning, harassing, intimidating message, that turned into text messaging and stated:

"You are lowdown.  You are lowdown.  I did not know you were that lowdown.  You took a picture of Ms. Eundee.  You are lowdown." Then Lynda Woods Brown Allen hung up the phone.

17

55.     Since Lynda  contacted Versie via Versie's personal iPhone number. Versie began to text Lynda back after this blatant harassment, bullying and intimidation.  Lynda was very hostile, harassing and intimidating to Versie, and Versie lashed back at Lynda after all the bible thumping ridicule.

56.     Lynda stated: "The video will show it was YOU.  Help Her Lord." Lynda's statement was referring to Versie taking pictures of Ms. Eundee.  *(See Exhibit E)*

57.     Lynda went on to slander Versie and stated:   "Blessed her Lord, she has nobody."  Lynda went on to slander Versie's  relationship with Versie's  son, and a relationship Versie had with a coworker. Lynda knew nothing about Versie's personal life based on facts. *(See Exhibit E)*

58.     Lynda  was a residential staff worker, and because she is a personal friend to Felicia, Lynda has  privy to confidential information, via Felicia and Athena S.

59.     Athena S broke confidentiality and created a hostile work environment. Ironically, Versie told Athena S. that Versie had a picture, but Versie took a picture of the mirror that reflected Ms. Eundee, not Ms. Eundee., and Versie never sent it or showed it to Athena S.

60.     Suffice to say, Lynda stated to in various conversations with and to Versie that she herself had reported to Felicia that Ms. Eundee is always sleeping.   Lynda stated to Versie that Felicia and Athena S. had saw Ms. Eundee on the video sleep.   Versie never took any pictures of Ms. Sally, and never reported that to Athena S.  Lynda totally fabricated that story.

61.     After Versie reported the harassment on April 26, 2021 to Athena S. *(Attachment 11, page 1)* Athena stated that we could schedule a meeting to address Versie's concerns. Athena S. was never available to schedule a meeting to address harassment.  When Versie asked

to view the video Lynda talked about, Athena S. said there was no video footage. *(Attachment 12, pps. 1-2)*

62.    Lynda's conduct was unwelcome; and the harassment occurred because Versie is older than Lynda. It also t affected the terms or conditions of employment; and   it was imputed to the  Athena S. Athena S. knew about the harassment and did nothing about it, and did nothing to prevent it.

63.    Following telling Athena S. about harassment, Versie received an email from Athena S. *(See Attachment 14)*. Versie was retaliated against, and completely taken off the schedule.

**RELIEF** – Versie C. McClay Chatman respectfully asks the court to order the Defendants to pay $250,000.00 each to Versie C. McClay Chatman.. That is Felicia Evans  ($250,000), Lynda Brown Wood Allen  ($250,000), Margaret Pruzin ($250,000), Athena Soleim ($250,000), and Nikki Wielgos ($250,000).

In addition, Versie C. McClay Chatman respectfully asks the court to order the Crisis Center Inc., Alternative House to pay Versie ($350,000);

Versie C. McClay Chatman respectfully asks the court to order every board member for Crisis Center, Inc., Alternative House to pay Chatman $100,000.00 each.

Versie C. McClay Chatman respectfully asks the court for all Defendants to pay the respective court fees and costs.

**DOCUMENTS:** I have attached a copy of the following document(s)

☒    Charge of Discrimination form filed with the Equal Employment Opportunity Commission or the Indiana Civil Rights Commission
☒    Notice of Right to Sue Letter
☒    Other:  Documents/Attachments/Exhibits supporting the Complaint

## FILING FEE

✔    Yes, I am paying the $402.00 filing fee.  I understand that I am responsible to
Notify the defendant bout this case as required by Federal Rule of Civil Procedure

No, I am filing a Motion to Proceed in Forma Pauperis and asking the court to
notify the defendant about this case.

[Initial Each Statement]

I will keep a copy of this complaint for my records.
I will promptly notify the court of any change of address.
I declared **under penalty of perjury** that the statements in this complaint are true.

Signature                                    Date

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

Versie C. McClay Chatman                |
                                        |
      Plaintiff                         |
                                        |
    v.                                  |      Case Number 2:21CV397
                                        |
Felicia L Evans, Nikki Wielgos,         |
Margaret Pruzin, Lynda Woods Brown      |
a/k/a Lynda Woods Brown Allen           |
Athena Soleim, Crisis Center, Inc.,     |
Alternative House, Crisis Center, Inc., |
Alternative House Board of Directors    |
      Defendant(s)                    |

## PLAINTIFFS'  AMENDED EMPLOYMENT DISCRIMINATION COMPLAINT PURSUANT TO  Fed. R. Civ. P. 15(a)(2)

      Pursuant to Rule 15 of the Federal Rules of Civil Procedure, Plaintiff, Versie C. McClay

Chatman was granted by the  Court a  leave to file the attached Amended Employment

Discrimination Complaint ("Amended Complaint").  Rule 15 provides that "a party may amend

its pleading [with] the court's leave" and that "[t]he court should freely give leave when justice

so.

Dated  March 4,  2022          Respectfully submitted,

                                    Versie, C. McClay Chatman, MSW Pro Se
                                    4406 Broadway
                                    Gary, Indiana  46408
                                    vechatman@sbcglobal.net
                                    (312) 330-0142

## CERTIFICATE OF SERVICE

I certify that on March 3, 2022 **PLAINTIFFS' AMENDED EMPLOYMENT**

**DISCRIMINATION COMPLAINT PURSUANT TO  Fed. R. Civ. P. 15(a)(2)**  was served

on Defendants' counsel Reminger Co., L.P.A c/o Trevor W. Wells by First Class Mail to:

2100 N. Main Street, Ste. 202
Crown Point, IN  46307

Dated  March 4, 2022                                      Respectfully submitted,

Versie, C. McClay Chatman, MSW Pro Se
4406 Broadway
Gary, Indiana  46408
vechatman@sbcglobal.net
(312) 330-0142

2